**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **SAM KANE BEEF PROCESSORS, LLC,[1]** | § | **Case No. 19-20020** |
| | § | |
| **Debtor.** | § | **Chapter 11** |

**DECLARATION OF RICHARD S. SCHMIDT IN SUPPORT OF**
**CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Richard S. Schmidt, hereby declare under penalty of perjury:

1.      I am the court appointed receiver (the "Receiver") for Sam Kane Beef Processors, LLC (the "**Debtor**" or "**SKB**").  In such capacity, I am generally familiar with the Debtor's operations, business affairs, books and records.  I am authorized to submit this Declaration on behalf of the Debtor.

2.      Except as otherwise indicated, all facts set forth in this declaration (the "**Declaration**") are based upon my personal knowledge, my discussions with members of the Debtor's management team and advisors, my review of relevant documents and information concerning the Debtor's business, financial affairs, and restructuring initiatives, or any opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

3.      I am generally familiar with the Debtor's day-to-day operations, business, financial affairs, and books and records.  I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of this chapter 11 case (the "**Chapter 11 Case**") and in support of:  (a) the Debtor's petition for relief under title 11 of the

---

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is: Sam Kane Beef Processors, LLC (0433).

United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"); and (b) the relief that the Debtor has requested from the Court pursuant to the motions and applications described herein (collectively, the "**First Day Pleadings**").

4.      As set forth in more detail, herein, the Debtor operates a meat-packing plant in Corpus Christi, Texas.  Prior to the Petition Date, the Debtor's operations were being funded by one of the Debtor's pre-petition secured lenders, Marquette (defined herein), pursuant to a Receivership Finance Stipulation (defined herein).  Under the Receivership Finance Stipulation, all of the Debtor's accounts receivable are paid to Marquette and then advanced to the Debtor to fund the purchase of cattle and operations.

5.      In reliance upon the Receivership Finance Stipulation, the Receiver has incurred payroll expenses, purchased and slaughtered cattle and begun to process slaughtered cattle for packaging and sale.  The nature of the Debtor's operations is such that, if the processing of the slaughtered beef is not completed in a timely manner, the product may spoil and become worthless.

6.      On January 22, 2019, Marquette failed to advance funds needed to pay for purchased cattle, fund payroll and other operating expenses incurred as requested by the Receiver in accordance with the Receivership Finance Stipulation. Additionally, Marquette failed to provide assurance to the Receiver that such expenses would be funded.

7.      Lacking assurance of continued for funding for cattle purchases and operations, the Debtor filed this bankruptcy case on emergency basis.  Under the circumstances, the relief sought in the First Day Pleadings is critical to Debtor's ability to preserve estate value.

8.      To familiarize the Court with the Debtor, the forces that caused the Debtor to commence this Chapter 11 Case, and the relief the Debtor seeks early in this Chapter 11 Case, this Declaration is organized in five parts.  Part I provides an introduction to the company and

information on its corporate history, business operations, and capital structure.  Part II describes the circumstances leading to the appointment of the Receiver over the Debtor.  Part III describes the post-receivership issues and circumstances leading to the commencement of this Chapter 11 Case.  Part IV sets forth the Debtor's objectives for this Chapter 11 Case.  Part V sets forth the relevant facts in support of each of the First Day Pleadings filed in connection with this Chapter 11 Case.

## I.   CORPORATE HISTORY AND BUSINESS OPERATIONS

### A.   Corporate History

9.     Founded in 1949 by Sam Kane, the Debtor operates a meat packing plant located at 9001 Leopard Street in Corpus Christi, Texas (the "**Facility**").  It is in the business of buying and selling livestock for purposes of slaughter, manufacturing, and preparing meat products for sale in commerce.  The Debtor is a Texas limited liability company that is 100% owned by TAAG Americas, LLC.  With over 700 employees, the Debtor plays an important role in the local and regional economy.

10.    As one of the few genuine "Texas Packers" left in the state, the Debtor is a leading independent, fully-automated processor and distributor of high-quality beef sourced from trusted Texas cattle ranchers.  With the closest comparable facilities located in the Texas panhandle, using an alternative facility would require many Texas cattle ranchers to bear additional costs to transport their product for processing.  As a result, the Debtor's 238,186 square foot facility in Corpus Christi is considered the hub of the South Texas beef industry.

11.    The Debtor's Facility is capable of processing 1,200 head of cattle per shift, or approximately 8,400 head of cattle per week.  In 2017 alone, the Debtor processed 204,000 head of cattle, and production increased to 324,000 head in 2018.  Due to its large commercial scale

capabilities, the Debtor's Facility has appraised value of approximately $55.6 million, and an estimated replacement value of $100 - $150 million.  In the fourth quarter of 2018, the Debtor had working capital assets of approximately $25 million in accounts receivable and $10 million in inventory.

**B.**     **Secured Debt**

12.     In or around June of 2014, the Debtor entered into that Loan and Security Agreement (as subsequently amended, the "**Rabo Note**") by and between the Debtor and Rabo Agrifinance, Inc. ("**Rabo**").  Pursuant to the Rabo Note, Rabo provided a Term Note in the amount of $12,000,000.00 (the "**Rabo Debt**").  The Rabo Debt is purportedly secured by first priority liens against all of the Debtor's equipment, general intangibles related to equipment, commercial tort claims (to the extent related to or proceeds of collateral) and a first mortgage against Debtor's Facility.

13.     Additionally, in or around April 2016, the debtor entered into that MCF Account Assignment & Security Agreement (as amended, the "**Marquette Note**") by and between the Debtor and Marquette Transportation Finance, LLC ("**Marquette**").  The Marquette Note is secured by a first lien all of the Debtor's present and future accounts, all of Debtor's other accounts; chattel paper, instruments, payment intangibles, general intangibles, and documents.

14.     As of July 2018, the Debtor was in default under the Marquette Note by failing to maintain sufficient reserves for payments resulting in over-advance on the Note.  The Debtor and Marquette subsequently entered into that Second Forbearance Agreement (the "**Forbearance Agreement**").  Pursuant to the Forbearance Agreement, as additional security, the Debtor granted Marquette a first mortgage against the Debtor's real property described as "Lot Three (3) Block One (1), GUTH PARKSIDE ANNEX, an addition in the City of Corpus Christi, Texas as shown

by map or plat thereof recorded in Volume 60, Page 33, Map Records of Nueces County, Texas;" and a second mortgage against the Debtor's Facility.

## II.   CIRCUMSTANCES LEADING TO RECEIVERSHIP

### A.   United States Investigation of the Debtor

15.    In the Spring of 2016, the United States Department of Agriculture began an investigation of SKB related to purported violations of the Packers and Stockyards Act of 1921, as amended ("**PSA**" or the "**Act**").  Among other things, PSA is the federal legislation that governs the Debtor's operations as a slaughterhouse and meat packing facility.  The Act attempts to foster fair competition among packers, market agencies, and dealers, and to provide payment protection. Under the Act, "packers," like SKB, must pay promptly for livestock purchased for slaughter on a carcass or "grade and weight" basis before the close of the next business day following the determination of the purchase price.

16.    An investigation notice letter was served on SKB in March 2016, and the actual investigation was commenced on May 11, 2016.  The investigation notice asserted that SKB was in violation of Section 409 of the PSA (7 U.S.C. § 228b) for failing to pay sellers within the time period required by the Act.  The investigation found that SKB paid sellers between ten to twenty-five days late in fourteen separate transactions related to the purchase of 797 head of livestock.

17.    As a result of the investigation, on January 12, 2017, an Administrative Complaint was filed against SKB with the United States Department of Agriculture.  On January 17, 2017, a Decision Without Hearing by Reason of Consent (the "**Consent Order**") was issued whereby SKB agreed to cease and desist from failing to timely pay sellers for the purchase price of livestock.

18.    On January 27, 2017, the Consent Order became final and effective. Notwithstanding the Consent Order, SKB allegedly continued to violate provisions of the PSA.

B.     **PSA Trust Dispute**

19.      In January 2018, as a result of the late payment violations, seventy-seven (77) livestock sellers filed Packer Trust claims against SKB under the provisions of the PSA in the total amount of $142,965,561.12.

20.      On June 8, 2018, SKB, as required by the Consent Order, provided to the United States an unaudited report showing it owed $34,960,000 to livestock sellers, and that the payments to sellers were made 38 days late, on average.

21.      On June 14, 2018, the United States filed a Complaint for Injunctive Relief against SKB.  The case was styled *United States of America v. Sam Kane Beef Processors, LLC*, Case No. 2:18-cv-00171 in the United States District Court for the Southern District of Texas, Corpus Christi Division.   The United States alleged that SKB failed to pay for livestock when due and requested a preliminary injunction against SKB until resolution of the litigation.  The relief requested in the complaint included, *inter alia*, a request that SKB consent to the establishment of a voluntary receivership in the event it is unable to meet conditions of payments in full to sellers.

22.      On July 19, 2018, a Motion to Intervene in the District Court case, with proposed complaint attached (the "**Intervenors Complaint**"), was filed by twenty-one (21) livestock sellers (the "**Intervenors**").[2] In addition to suing SKB, various other entities were named as defendants, including Marapro, LLC, ProAlamo Foods, LLC, ProValley Foods, LLC, ProCoastal, LLC, TAAG Americas, LLC,  and Alfredo Fernandez and Carlos Fernandez, individually.  Marquette

---

[2] Prior to filing the Motion to Intervene but after the United States filed its Complaint on June 14, 2018, the Intervenors worked with SKB and its lender, Marquette, on a term sheet regarding the operations of SKB. Pursuant to the term sheet, Chris Daniel, an individual with significant experience in the packing industry, was named and installed as Chief Restructuring Officer of SKB.

and Rabo, two of SKB's secured lenders, were also named as defendants.  This intervention motion was later approved by the District Court and the Intervenors Complaint was filed July 25, 2018.

23.     The Intervenors asserted they were owed over $35 million and stated that they timely filed claims with the United States Department of Agriculture to preserve their rights under the PSA providing for a Packer Trust for the benefit of unpaid sellers of livestock.   Specifically, the Intervenors alleged that a "trust" created under the PSA for their benefit includes all livestock in the possession of the Debtor, all cash on hand and in banks, as well as all inventories, accounts receivable and the proceeds from meat, food products, and livestock products. The Intervenors further asserted that the inventory and proceeds of any sales by SKB are considered part of the *res* of their trust and such assets remain trust assets for as long as SKB has unpaid livestock suppliers.

24.     Additionally, the Intervenors argued that Marquette and Rabo held cash and receivables subject to their trust claims. The Intervenors claim that Marquette and Rabo, as lenders to SKB, are subject to the statutory trust and are deemed to be on constructive notice (since at least early 2017) that all assets of SKB are subject to the trust for the benefit of the Intervenors.  Notably, the Intervenors Complaint included, among other requests for relief, an application for emergency appointment of a receiver.

25.     On July 25, 2018, an agreed preliminary injunction (the "**Preliminary Injunction**") was entered by the District Court.   The Preliminary Injunction contained (i) provisions requiring SKB to comply with the PSA, including the requirement to pay the full purchase price of livestock by cash or cashier's check no later than the next business day following the purchase and transfer of livestock, and (ii) a requirement that SKB preserve and administer the statutory trust required under federal law.  With respect to the past due amounts, SKB was ordered to pay to its creditors, the Intervenors, the sum of $20 million no later than sixty (60) days

following entry of the Preliminary Injunction.  It also provided that SKB's failure to make any one of the scheduled payments noted in the Preliminary Injunction would result in the District Court immediately appointing a receiver to manage its financial affairs.

**C.**     **The Receivership and Authority of the Receiver**

26.     On October 3, 2018, the United States filed its Motion for Appointment of a Receiver. [Doc. No. 40 in Case No. 2:18-cv-00171].  The motion requested that the District Court appoint a receiver in light of SKB's failure to make the required payments as provided in the Preliminary Injunction entered on July 25, 2018.

27.     On October 5, 2018 the District Court entered its Order Appointing Receiver (the "**Receivership Order**"). [Doc. No. 45 in Case No. 2:18-cv-00171].  Pursuant to the Receivership Order, Richard S. Schmidt was appointed as the receiver (the "**Receiver**") over the assets of SKB.

28.     The Receivership Order grants the Receiver broad management authority over SKB.  Specifically, paragraph 12 of the Receivership Order gives the Receiver the power and authority to:

> "a)  Operate, manage, control and conduct [the Debtor's] business operations in the ordinary and usual course and do all things ordinarily performed by owners, managers, and operators of similar businesses while having exclusive and sole control of and authority to act for [the Debtor], to the exclusion of all others including without limitation, [ ] any and all other management currently in place;
>
> …
>
> c)   The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by any and all members, officers, directors, managers, general and limited partners, trustees, and other governing agents.  The Receiver shall have the sole and exclusive authority to direct employees, contractors, bankers, investment advisors, accountants, attorneys, and other agents of [the Debtor];
>
> …
>
> g)   Perform all acts necessary to conserve, hold manage, and preserve the value of the Receivership Estate, in order to prevent any irreparable loss, damage, and injury to the Estate. …
>
> …

k)   Take such other actions as the Receiver may reasonably consider to be necessary or advisable in connection with the day-to-day operation of [the Debtor] and Receivership Estate subject to the right of all parties to appeal any decision of the Receiver to this court;…"

*See* Receivership Order, ¶ 12.

29.    Additionally, the Receivership Order authorizes the expenditure of PSA Trust assets of the Debtor for the purpose of compensation of the Receiver and for reimbursement of all expenses incurred by the Receiver.

### III.    CIRCUMSTANCES LEADING TO THIS CHAPTER 11 CASE

30.    Pursuant to the Receivership Order, which requires Marquette to provide funds for the purchase of cattle and operations, Marquette and the Debtor entered into that certain Stipulation and Agreement Regarding Receivership Financing (the "Stipulation") and that certain Amendment Six to Amended and Restated MCF Account Assignment and Security Agreement (the "Sixth Amended Marquette Note, and collectively with the Stipulation, the "Receivership Finance Stipulation"). The Receivership Finance Stipulation requires Marquette to provide funding, in accordance with the terms of the Marquette Note (as amended), and subject to certain approved budgets. In reliance upon this agreement, the Receiver has continued to operate the Facility and purchase cattle.

31.    On January 18, 2019, the Debtor's facility was shut down following a violation letter received from the City of Corpus Christi asserting the facility was out of compliance with waste water treatment regulations. The City provided a detailed checklist of items to be completed. The Debtor worked diligently to complete a checklist of corrective actions over the weekend and reopen on Monday, January 21, 2019.

32.     Additionally, on Sunday, January 20, 2019, the Debtor was unable to obtain assurance from Marquette that further funding would be provided for cattle purchases and operations.  As a result, the Debtor's suppliers of cattle have refused to provide further cattle deliveries to the Debtor and, without the relief sought in connection with its First Day Motions, the Debtor is unable to continue operations.

## IV.     OBJECTIVES OF CHAPTER 11 CASE

33.     On or about November 3, 2018, the Receiver engaged the Gordian Group, LLC ("Gordian") to market and sale the Debtor's assets.  Pursuant to such engagement, Gordian has marketed the Debtor's assets, solicited and received bids, and has engaged in continuing negotiations with potential purchasers.  As a result of the efforts, the Debtor has received certain bids for the purchase of the Debtor's assets.  The Debtor, with the aid of counsel and Gordian, is in the process of selecting a lead bidder and negotiating definitive documentation for a stalking horse transaction.  The Debtor filed this bankruptcy case, in part, to ensure its ability to consummate such a transaction and intends to move quickly to do so.

## V.     RELIEF SOUGHT IN THE DEBTOR'S FIRST DAY PLEADINGS

A.     **Debtor's Emergency Motion for Interim Order (I) Authorizing the Debtor to (A) Use Property of the Estate, or in the Alternative, (B) Use Cash Collateral Pursuant to Section 363(C) of the Bankruptcy Code; (II) Granting Adequate Protection for the Use Therefore; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 as to Use of Cash Collateral; and (IV) Granting Related Relief ("Cash Collateral Motion").**

34.     In the Cash Collateral Motion, the Debtor has requested entry of an interim order (the "**Interim Cash Collateral Order**"): (I) Authorizing the Debtor to (A) Use of Property of the Estate, or in the alternative, (B) Use Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code, (II) Granting Adequate Protection for the Use Thereof, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 as to Use of Cash Collateral, and (IV) Granting Related Relief.

35.     Pursuant to Bankruptcy Rule 4001(b), the following summarizes the material terms of the Interim Order.  The Debtor seeks authority to use property that is likely subject to a trust (the "**Trust**") created pursuant to the PSA.  To the extent that the property is determined to be Trust property, the Debtor is authorized to use Trust proceeds to preserve the Trust assets in accordance with the Receivership Order [Doc. No. 45 in Case No. 2:18-cv-00171].

36.     Further, to the extent the property is subject to the Trust, the Debtor's estate may lack any beneficial interest in such property because the value of the assets available to satisfy Trust claims is less than the total amount of claims.  As such, it is unlikely that any alleged secured creditor, including Marquette, will have any actual economic interest in the assets for which the Debtor seeks authority to use.  Thus, under those circumstances, only the PSA Trust claimants' approval is necessary for the continued use of the property.

37.     In the alternative, if the property is ultimately determined to be Cash Collateral, the Debtor seeks authority for continued use of alleged Cash Collateral.  The Debtor seeks to use the property and/or alleged Cash Collateral for the express purpose of preserving perishable estate assets.  Use of Cash Collateral is necessary to prevent immediate, irreparable harm to any alleged secured creditor's collateral by completing the preparation, packaging, and sale of these perishable goods. Thus, given the nature of the Debtor's business and the reality that the estate's assets are immediately perishable, the failure to use the alleged Cash Collateral would actually leave any alleged secured lender in a worse position.  Therefore, continuing the business as a going concern provides a process by which the secured lender is adequately protected.

38.     For these and the reasons set forth in the Cash Collateral Motion, the Debtor asks this Court to grant emergency relief (i) directing the Debtor's customers to remit all amounts owed directly to the Debtor, rather than Marquette, (ii) requiring Marquette to immediately turn-over to

the Debtor all cash proceeds received by Marquette after the filing of the Debtor's petition, and (iii) and that Marquette provide an accounting of all receivables collected since it last funded the Debtor's operations on Thursday, January 17, 2019.

**B.    Debtor's Emergency Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 507(a) Authorizing the Debtor to Pay Prepetition Wages to Employees ("Wage Motion").**

39.    In the Wage Motion, the Debtor has requested entry of an order: Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 507(a) Authorizing the Debtor to Pay Prepetition Wages to Employees.

40.    The Debtor has requested that this Court, pursuant to §§ 105(a), 363(b), and 507(a) of the Bankruptcy Code, and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), enter an Order (i) authorizing, but not directing, the Debtor to (a) pay, in its sole discretion, all obligations incurred under or related to wages, salaries, other compensation, reimbursable employee expenses, and payroll service fees relating to Employees (collectively, the "**Employee Obligations**") and all costs related to the foregoing, and (b) maintain and continue to honor their practices, programs, and policies in place for their employees, as such may be modified, amended, or supplemented from time to time in the ordinary course of business, and (ii) authorizing and directing the Debtor's banks, financial institutions, and professional employment organizations, to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to the Employee Obligations.

**C.    Debtor's Emergency Motion for Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, (C) Establishing Procedures for Determining Adequate Assurance of Payment, and (D) Granting Related Relief ("Utility Motion").**

41.    In the Utilities Motion, the Debtor has requested entry interim and final orders: A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (B) Deeming Utilities

Adequately Assured of Future Performance, (C) Establishing Procedures for Determining Adequate Assurance of Payment, and (D) Granting Related Relief.

42.      The Debtor has requested, pursuant to Bankruptcy Code §§ 105(a) and 366, the entry of an interim order (a) prohibiting the Utility Providers from altering, refusing, or discontinuing service on account of prepetition invoices, (b) deeming utilities adequately assured of future performance, and (c) establishing the procedures for determining adequate assurance of payment.

43.      The Debtor also seeks a final hearing on the Utilities Motion Court on a date in advance of the expiration of thirty (30) days following the Petition Date in order to, as discussed below: (a) address outstanding objections to the Motion, if any, and (b) resolve any disputes regarding adequate assurance of payment prior to the expiration of the thirty (30) day period set forth in section 366(c)(2) of the Bankruptcy Code.

**D.      Debtor's Emergency Motion for Entry of an Order Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, and (D) Statements of Financial Affairs ("Motion to Extend Time to File Schedules").**

44.      In the Motion to Extend Time to File Schedules, the Debtor has requested entry of an order: Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, and (D) Statements of Financial Affairs.

45.      Due to the circumstances set forth herein, the Debtor has not yet begun to prepare Schedules of Assets and Liabilities or a Statement of Financial Affairs.  In the immediate future, the majority of the Debtor's efforts will be focused upon stabilizing operations and pursuing a sale of substantially all of its assets.  The Debtor has hired The Claro Group as financial advisor to assist with its bankruptcy reporting obligations but believes that an extension of the deadline to

file its Schedules of Assets and Liabilities or a Statement of Financial Affairs is necessary to ensure that the process is completely accurately.

46.     The Debtor seeks entry of an order granting the Debtor an additional twenty-one (21) days, without prejudice to the Debtor's ability to request additional extensions, to file its Schedules and Statements and granting other related relief not expressly stated herein.

47.     Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing Declaration of Richard S. Schmidt in Support of Chapter 11 Petition and First Day Pleadings is true and correct to the best of my knowledge and belief.

Dated:  January 23, 2019

                                    */s/ Richard S. Schmidt*
                                    _____
                                    By:  Richard S. Schmidt
                                    Title: Receiver